**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

SPECTRA MEDICAL DEVICES, LLC,  )
            )
     Plaintiff,    )  Case No. _____
            )
  v.         )
            )
ANTHONY CHARLES ARRIGO,   )
ANTHONY EDWARD ARRIGO,   )
AGUSTIN TURRIZA,     )
ARRIGO MEDICAL, LLC, and   )
STELLA CONSULTING, LLC,   )
            )
     Defendants.   )

## COMPLAINT

Plaintiff Spectra Medical Devices, LLC, by and through undersigned counsel, complains against Defendants Anthony Charles Arrigo, Anthony Edward Arrigo, Agustin Turriza, Arrigo Medical, LLC, and Stella Consulting, LLC, as follows.

## INTRODUCTION

1. Plaintiff Spectra Medical Devices, LLC ("Spectra") is a medical device company that specializes in the manufacture and sale of state of the art needles for medical procedures. This action concerns the deception, theft, and other misconduct of three former, high-level employees of Spectra, Anthony Charles Arrigo ("Arrigo Sr."), Anthony Edward Arrigo ("Arrigo Jr." or "Jr.") and Agustin Turriza.[1] Defendants defrauded Spectra in the $128 million sale of Arrigo Sr.'s former company, Spectra Medical Devices, Inc. ("Old Spectra") by using improper revenue recognition practices to inflate the purchase price and fraudulently induce the sale. Spectra's claims relating to

---

[1] Defendant Anthony Charles Arrigo is the father of Defendant Anthony Edward Arrigo. Although these Defendants' names do not include the suffixes "Sr." and "Jr.," Spectra refers to them as "Arrigo Sr." and "Arrigo Jr." for ease of exposition.

that misconduct are subject to the exclusive jurisdiction of the courts in Delaware. This action pertains not to that deal, but arises out of Defendants' subsequent efforts to steal Spectra's trade secrets, including client lists and pricing information, and to launch a competing company in breach of multiple non-competition and non-solicitation agreements.

2.    This action also concerns Defendants' conspiracy to delete and destroy Spectra's data, documents, and other property to hide evidence of Arrigo Sr.'s fraud in connection with the sale transaction and evidence of Defendants' efforts to steal trade secrets and operate competing businesses. Defendants' bad faith efforts in this regard include:

a.    Arrigo Jr. deleted approximately 24,000 emails from his company email account before he left Spectra. He copied and took substantial contents of his company email account before performing these deletions in an effort to ensure he would have a copy of the critical company information in his email, but Spectra would not. Turriza similarly, around the same time, deleted approximately 51,000 emails from his company Outlook account.

b.    Turriza lied and took advantage of his position of trust as a senior Spectra executive to get access to the Arrigos' company email accounts after they left the company. He used this access to perform unauthorized deletions tens of thousands of items from the Arrigos' email accounts, including sent and received emails, many of which he not only deleted from inboxes and sent folders but also purged from recovery files in an attempt to ensure their permanent deletion. Turriza had phone discussions with the Arrigos before, after, *and during* an approximately two-hour time period on August 29, 2022, in which he deleted approximately 27,000 items from Arrigo Sr.'s email account. These deletions occurred less than two weeks after Spectra sent Arrigo Sr. a notice of potential

2

indemnification claims against him and Old Spectra based on his fraud in connection with the sale of Old Spectra's assets. The notice included a direction to preserve and retain documents.

c.       Despite Spectra's repeated demands for the return of its property, Arrigo Sr. and Jr. refused to return their company-issued laptop computers until months after their respective departures from Spectra. Defendants installed new operating systems on both computers *after* Arrigo Sr. received the preservation notice and shortly before returning the computers to Spectra in September 2022. This resulted in the permanent deletion of data stored on the computers.

d.       During Spectra's investigation into Turriza's misconduct regarding the deletion of company documents, Spectra suspended his employment. When Spectra's representatives instructed him to return his company-owned cell phone and told him that he could not delete any information from that phone before turning it over, Turriza intentionally performed a factory reset of the phone, permanently deleting company data stored on the phone.

e.       Just a few days later, Turriza returned his company-issued iPad after performing a factory reset on that device, despite Spectra instructing him in writing in the intervening days not to delete any further company data. The factory reset resulted in the deletion of data on the iPad.

3.       Defendants' coordinated pattern of misconduct shows their complete disregard for their legal obligations. The only conclusion to be drawn from their extensive efforts to delete Spectra's documents is that Defendants knew how calamitous those documents would be for them, revealing that: (a) Arrigo Sr. cheated Spectra in the sale of Old Spectra; and (b) Defendants have

been scheming to operate a competing business in violation of restrictive covenants, and using Spectra's trade secrets to do so.

4.      Spectra is entitled to compensatory damages, punitive and multiple damages (including under G.L. 93A, § 11), and attorney's fees, as well as injunctive relief (a) enjoining Defendants from using or disclosing Spectra's trade secrets and confidential information, (b) enjoining Defendants from competing with Spectra or soliciting its customers, vendors, suppliers, and employees in violation of restrictive covenants, (c) enjoining Defendants from further destroying evidence, and (d) ordering Defendants to return to Spectra its property.

## JURISDICTION

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      This Court has subject matter jurisdiction over Spectra's claims arising under federal law pursuant to 28 U.S.C. § 1331.

7.      This Court has subject matter jurisdiction over Spectra's claims arising under state law pursuant to 28 U.S.C. § 1367 because its state-law claims are premised on the same set of facts as its federal-law claims.

8.      This Court has personal jurisdiction over Arrigo Sr. pursuant to G.L. 223A §§ 2, 3(a), (c), (d).

9.      This Court has personal jurisdiction over Arrigo Jr. pursuant to G.L. 223A §§ 2, 3(a), (c), (d).

10.      This Court has personal jurisdiction over Turriza pursuant to G.L. 223A § 3(a), (c), (d).

11.     This Court has personal jurisdiction over Arrigo Medical, LLC pursuant to §§ 2, 3(a), (c), (d).

12.     This Court has personal jurisdiction over Stella Consulting, LLC pursuant to § 3(a), (c), (d).

## VENUE

13.     Venue lies in this Court because a substantial part of the events or omissions that give rise to this action took place in the District of Massachusetts and because a substantial part of the property that is the subject of the action is situated in the District of Massachusetts.

14.     Venue also lies in this Court because Arrigo Sr., Arrigo Jr., and Turriza each executed an employment agreement with Spectra, and Turriza executed a bonus agreement, containing a clause providing for exclusive venue in state and federal courts within Massachusetts for claims arising out of or relating to the employment agreements.

## PARTIES

15.     Plaintiff Spectra Medical Devices, LLC, is a limited liability company. Its operations in the United States are based in Massachusetts. Spectra's manufacturing center is in South Korea. During their respective employments with Spectra, Arrigo Sr., Arrigo Jr., and Turriza worked from Spectra's offices in Massachusetts.

16.     Spectra's sole member is NQ PE Project Hogan Midco., Inc. ("Midco"), a Delaware corporation. Midco's principal place of business is in North Carolina. Accordingly, Spectra is a citizen of Delaware and North Carolina. Spectra is indirectly owned by NQ PE Project Hogan Aggregator, L.P., a limited partnership.

17.     Arrigo Sr. is Spectra's former Chief Executive Officer. He resigned his employment effective June 17, 2022. Arrigo was a member of the board of managers of NQ PE

Project Hogan Aggregator, L.P., until he resigned that position on July 6, 2022. Upon information and belief, Arrigo Sr. is a citizen of Massachusetts.

18.     Arrigo Jr. is Spectra's former Director, Global Sales and Marketing. He provided notice of his resignation from Spectra on June 30, 2022, and his last day was July 15, 2022. Upon information and belief, Arrigo Jr. is a citizen of Massachusetts.

19.     Turriza is Spectra's former Corporate Director and, beginning in or around July 2022, Spectra's Vice President of Product Excellence.[2] Spectra terminated his employment on September 29, 2022. Upon information and belief, Turriza is a citizen of New Hampshire.

20.     Arrigo Medical, LLC ("Arrigo Medical") is a limited liability company. Upon information and belief, Arrigo Sr. and/or Arrigo Jr. are the founders and members of Arrigo Medical. Upon information and belief, Arrigo Medical is a citizen of Massachusetts.

21.     Stella Consulting, LLC ("Stella Consulting") is a limited liability company. Turriza is the sole member of Stella Consulting. Upon information and belief, Stella Consulting is a citizen of New Hampshire.

## FACTUAL BACKGROUND

**I.     Arrigo Sr., Arrigo Jr., and Turriza were among the highest-ranking and most important employees at Spectra and Old Spectra**

22.     Prior to the sale of its assets to Spectra on October 1, 2021, Old Spectra was a medical and surgical device company specializing in the design and manufacturing of needles used in medical procedures.[3]

---

[2]     Turriza's duties did not change when Spectra gave him a new title.
[3]     Old Spectra also distributed several generic injectable drug products and other disposable medical products.

23.     Arrigo Sr. founded Old Spectra in 1995. At all times relevant to this Complaint, Arrigo Sr. has been the CEO and owner of Old Spectra.[4] Following Spectra's purchase of Old Spectra's assets on October 1, 2021, Arrigo Sr. became CEO of Spectra. He held this role until his resignation on June 17, 2022, after more than 30 years in the business of manufacturing medical needles. As CEO of Old Spectra and then Spectra, Arrigo Sr. oversaw substantially all of each company's business. Arrigo Sr. also was a key relationship manager for Spectra's largest customers.

24.     Arrigo Jr. was an employee of Old Spectra and, following the sale, of Spectra, for more than 13 years until he gave his notice on June 30, 2022, and left Spectra on July 15, 2022. At the time of his resignation, Arrigo Jr. was Spectra's Director, Global Sales and Marketing. He had substantial responsibilities for building and maintaining customer relationships. Arrigo Jr. was a key relationship manager for many of Spectra's customers.

25.     Defendant Turriza was an employee of Old Spectra and, following the sale, of Spectra, for approximately 17 years until his for-cause termination on September 29, 2022. At the time of his termination, Turriza's title was Vice President of Product Excellence. His formal responsibilities included overseeing Quality, Regulatory Affairs, Research and Development, Supply Chain, and Product Development. He also had significant responsibility for interactions with customers and key suppliers, and his role frequently extended beyond his formal responsibilities. Approximately 2/3 of Spectra's U.S.-based employees reported to Turriza, either directly or indirectly. He was also the main company contact for the Food and Drug Administration and various other regulatory authorities.

---

[4]     The only other owner of Old Spectra is Arrigo Sr.'s wife.

26.     Within the course of their respective employments by Spectra, Arrigo Sr., Arrigo Jr., and Turriza had access to Spectra's confidential information and trade secrets, including customer and pricing lists and information about Spectra's quality and regulatory programs, product development, supply chain, manufacturing processes, research and development, and customer needs.

27.     Until their respective departures from the company, the three individual Defendants were among the very highest-ranking executives at Old Spectra and Spectra. They held positions of significant trust and responsibility. For most customers, suppliers, service providers, and other key company contacts, one or more of Defendants were the face of Spectra. Virtually all significant customer issues came to and were handled by one or more of Defendants. These three, especially Turriza, were integral in responding to inquiries from Spectra's customers and in working with customers on custom needle orders and other engineering or research and development projects. Defendants also were the key liaisons between the U.S.-based team and Spectra's manufacturing and engineering team in South Korea. Defendants frequently traveled to South Korea to oversee the company's operations there.

28.     Arrigo Sr., Arrigo Jr., and Turriza each owed a duty of loyalty to Spectra.

**II.     In connection with the Equity and Asset Purchase Agreement, Arrigo Sr. made representations and warranties he knew were false and agreed to restrictive covenants that he has since violated**

29.     Upon information and belief, Arrigo Sr. exerted total or near-total control over all aspects of Old Spectra's business at all times relevant to this Complaint.

30.     On October 1, 2021, Spectra acquired Old Spectra's assets and the equity of its subsidiaries pursuant to the Equity and Asset Purchase Agreement ("EAPA").

31.     Spectra and Old Spectra calculated, without limitation, the purchase price under the EAPA as a multiple of Old Spectra's EBITDA during a specific time period spanning 2020 and

2021. An increase in revenue over that period would significantly increase, without limitation, Old

Spectra's EBITDA and, hence, materially increase the purchase price.

32.     Under the EAPA, Old Spectra made representations and warranties to Spectra,

including, without limitation, that (1) Old Spectra's financial statements had been prepared in

accordance with Generally Accepted Accounting Principles ("GAAP"); (2) Old Spectra's financial

statements were correct and complete and fairly presented in all material respects; and (3) Old

Spectra had adequate and effective internal accounting controls.

33.     Old Spectra did not disclose any exceptions to these representations and warranties

related to its revenue recognition practices in the Disclosure Letter to the EAPA.

34.     Section 5.08 of the EAPA restricts Old Spectra and its affiliates—which includes

Arrigo Sr. and Jr.—from competing with Spectra's business, directly or indirectly, for a period of

five years from the EAPA's execution. Section 5.08 also restricts Old Spectra and its affiliates

from soliciting Spectra's customers, vendors, suppliers, and employees for a period of five years

from the date of execution of the EAPA.

35.     Arrigo Sr., Spectra, and Old Spectra entered into a Restrictive Covenant Agreement

("RCA") on August 31, 2021. Sections 3 and 4 of the RCA, respectively, prohibit Arrigo Sr. from

disclosing Spectra's confidential information and contain restrictive covenants similar to the ones

in Section 5.08 of the EAPA.

36.     Arrigo Sr. is also subject to non-competition and non-solicitation covenants under

Annex A of the Amended and Restated Limited Partnership Agreement of NQ PE Project Hogan

Aggregator, L.P. ("LPA"), effective on October 1, 2021.

37.     Section 9.02 of the EAPA requires Old Spectra to indemnify Spectra against Old

Spectra's and/or its affiliates' breaches of the foregoing representations and warranties and

restrictive covenants. Section 9.05 sets forth an indemnification procedure whereby a party claiming an indemnifiable loss must provide written notice of the basis for the claim.

38.     The EAPA, RCA, and LPA all contain forum selection clauses designating Delaware as the venue for claims relating to or arising out of those agreements. Spectra does not assert any such claims in this action, but these agreements are relevant to the instant Complaint because they provide context for the relationship between the parties and because Defendants unlawfully tried to destroy and conceal evidence of Arrigo Sr.'s and Old Spectra's fraud in connection with those agreements, and Defendants' efforts to destroy and conceal such evidence are one of the subjects of this action.

**III.   In connection with the purchase, Spectra and the Arrigos entered Employment Agreements, and Spectra and Turriza entered a Sale Transaction Bonus Agreement and an Employment Agreement**

39.     On October 1, 2021, Spectra and Arrigo Sr. executed an Employment Agreement. Arrigo Sr.'s Employment Agreement is attached hereto as Exhibit 1.

40.     Section 1 of Arrigo Sr.'s Employment Agreement requires him to "serve [Spectra] faithfully and to the best of [his] ability," and to "devote [his] full time, energy, experience and talents to the business of [Spectra]."

41.     Section 9 of Arrigo Sr.'s Employment Agreement requires him to protect Spectra's confidential information, including, without limitation, by agreeing that Spectra's confidential information is a protectable business interest; to hold Spectra's confidential information in strictest confidence; to not disclose Spectra's confidential information to a third party or use Spectra's confidential information for his benefit or a third party's benefit; to not use Spectra's confidential

information for any purpose unrelated to Spectra' business; and to not copy any of Spectra's confidential information.[5]

42.     Section 11 of Arrigo Sr.'s Employment Agreement prohibits him from owning, operating, managing, controlling, advising, being employed by, or being connected in any way with a competing business during his employment with Spectra and for a period of 12 months following termination of his employment. Section 11 also prohibits him from soliciting any of Spectra's customers, vendors, suppliers, and employees, during his employment with Spectra and for a period of one year after termination of his employment.

43.     In Section 13 of Arrigo Sr.'s Employment Agreement, he agreed that the foregoing contractual provisions are reasonable and necessary in order to protect Spectra's legitimate business interests and that Spectra is entitled to declaratory and injunctive relief in the event of a breach or threatened breach of those provisions.

44.     Arrigo Sr.'s Employment Agreement and the restrictive covenants therein were supported by valid consideration.

45.     On October 1, 2021, Spectra and Arrigo Jr. executed an Employment Agreement. Arrigo Jr.'s Employment Agreement is attached hereto as Exhibit 2.

46.     Arrigo Jr.'s Employment Agreement requires him to "serve [Spectra] faithfully and to the best of [his] ability," and to "devote [his] full time, energy, experience and talents to the business of [Spectra]."

---

[5]     For ease of exposition and the Court's convenience, Spectra summarizes the confidentiality provisions and restrictive covenants to which Defendants are subject in the body of the Complaint. In Appendix A to the Complaint, Spectra sets forth in full the confidentiality provisions and restrictive covenants that form the basis for claims in the Complaint. Spectra avers that the contractual language quoted in Appendix A and contained in the agreements referenced in this Complaint controls to the extent Defendants assert the existence of any conflict and/or ambiguity in Spectra's allegations concerning the content of those provisions. Spectra expressly reserves all rights granted to it under any contract referenced in the Complaint.

47.     Section 9 of Arrigo Jr.'s Employment Agreement requires him to protect Spectra's confidential information, including, without limitation, by agreeing that Spectra's confidential information is a protectable business interest; to hold Spectra's confidential information in strictest confidence; to not disclose Spectra's confidential information to a third party or use Spectra's confidential information for his benefit or a third party's benefit; to not use Spectra's confidential information for any purpose unrelated to Spectra' business; and to not copy any of Spectra's confidential information.

48.     Section 11 of Arrigo Jr.'s Employment Agreement prohibits him from owning, operating, managing, controlling, advising, being employed by, or being connected in any way with a competing business during his employment with Spectra and for a period of 12 months following termination of his employment. Section 11 also prohibits him from soliciting any of Spectra's customers, vendors, suppliers, and employees, during his employment with Spectra and for a period of one year after termination of his employment.

49.     In Section 13 of Arrigo Jr.'s Employment Agreement, he agreed that the foregoing restrictive covenants are reasonable and necessary in order to protect Spectra's legitimate business interests and that Spectra is entitled to declaratory and injunctive relief in the event of a breach or threatened breach of the restrictive covenants.

50.     Arrigo Jr.'s Employment Agreement and the restrictive covenants therein are supported by valid consideration.

51.     On August 30, 2021, Old Spectra and Turriza executed a Sale Transaction Bonus Agreement ("STBA"). The STBA is attached hereto as Exhibit 3. Section 1 of the STBA provided that Turriza would receive a Sale Transaction Bonus of $250,000, payable in three installments of 25 percent, 25 percent, and 50 percent, if certain conditions were met.

52.    Old Spectra assigned its rights and obligations under the STBA to Spectra.

53.    Section 1 of the STBA explicitly conditions payment of the Sale Transaction Bonus on Turriza's "continued compliance with this Agreement as of the date of any payment of the Sale Transaction Bonus." The STBA conditions Spectra's obligation to pay the Sale Transaction Bonus on the "Post-Closing Conditions."

54.    One of the "Post-Closing Conditions" is Turriza's "satisfactory performance of such post-closing services as shall be set forth in a services or similar agreement that is executed in connection with the Sale Transaction and is mutually agreeable to [Turriza] and [Spectra] following the Sale Transaction."

55.    The STBA further provides that if Turriza fails to meet the Post-Closing Conditions, he "agree[s] to repay any payments [he] ha[s] received hereunder to [Spectra]."

56.    Section 2 of the STBA requires Turriza to refrain from disclosing Spectra's confidential information to any third party. Turriza acknowledged in Section 2 of the STBA that such disclosure would cause competitive harm to Spectra.

57.    Section 3 of the STBA prohibits Turriza from soliciting Spectra's customers, vendors, suppliers, and employees during his period of employment and for two years thereafter. Turriza acknowledged in the STBA that Spectra would be irreparably injured by a breach of Section 2 or 3 and that in such event Spectra would be entitled, without limitation, to declaratory and injunctive relief.

58.    Spectra's obligation to pay Turriza any portion of the Sale Transaction Bonus was conditioned on Turriza's satisfactory performance of the duties set forth in both the STBA and in his Employment Agreement with Spectra, executed on June 3, 2022. Turriza's Employment Agreement is attached as Exhibit 4.

59.    Turriza's Employment Agreement requires him to "serve [Spectra] faithfully and to the best of [his] ability," and to "devote [his] full time, energy, experience and talents to the business of [Spectra]."

60.    Section 10 of Turriza's Employment Agreement requires him to protect Spectra's confidential information, including, without limitation, by agreeing that Spectra's confidential information is a protectable business interest; to hold Spectra's confidential information in strictest confidence; to not disclose Spectra's confidential information to a third party or use Spectra's confidential information for his benefit or a third party's benefit; to not use Spectra's confidential information for any purpose unrelated to Spectra' business; and to not copy any of Spectra's confidential information.

61.    Section 12 of Turriza's Employment Agreement prohibits him from owning, operating, managing, controlling, advising, being employed by, or being connected in any way with a competing business during his employment with Spectra and for a period of 12 months following termination of his employment. Section 12 also prohibits him from soliciting any of Spectra's customers, vendors, suppliers, and employees, during his employment with Spectra and for a period of one year after termination of his employment.

62.    In Section 14 of Turriza's Employment Agreement, he agreed that the restrictive covenants contained therein are reasonable and necessary in order to protect Spectra's legitimate business interests and that Spectra is entitled to declaratory and injunctive relief in the event of a breach or threatened breach of the restrictive covenants.

63.    Spectra paid Turriza the first installment of $62,500 under the STBA on October 1, 2021. Spectra paid Turriza the second installment of $62,500 on April 1, 2022.

64.    Spectra terminated Turriza's employment for cause pursuant to the terms of Section 9 of his Employment Agreement on September 29, 2022.

65.    Because Turriza did not satisfy the Post-Closing Condition that he satisfactorily perform the post-closing services as set forth in his Employment Agreement, Spectra was relieved from its obligation to pay Turriza the third and final installment of $125,000 under the Sale Transaction Bonus.

66.    Spectra is also entitled to repayment of the first two installments of the Sale Transaction Bonus that Spectra has already paid Turriza because Turriza failed to satisfy the Post-Closing Conditions.

67.    The STBA, Turriza's Employment Agreement, and the restrictive covenants therein were supported by valid consideration.

68.    Section 14 of Arrigo Sr. and Jr.'s respective Employment Agreements and Section 15 of Turriza's Employment Agreement state that each is "subject to . . . all terms and conditions in any employee handbook applicable to [Spectra's] employees; provided that [they] have been provided with a copy thereof and all amendments thereto." During the period of the individual Defendants' respective employments, each Defendant was provided with and had access to a copy of the employee handbook and all amendments thereto.

69.    Spectra's employee handbook states, among other things:

    a.    "All employees must cooperate with all investigations."

    b.    "The following are examples of some, but not all, conduct which can be considered unacceptable: . . . Stealing, removing, or defacing Spectra's property or a co-worker's property, and/or disclosure of confidential business information[;] [f]ailure to follow lawful instructions of a Manager/Supervisor[;] [w]illful or careless destruction or damage to Company assets or to the equipment or possessions of another employee."

c.  "Employees should not access a file or retrieve any stored communications without having specific authorization."

d.  "Spectra also expects that employees will provide truthful information when participating in an investigation."

e.  "Spectra considers the information acquired in the course of doing your job to be confidential in nature and for Company use only. This includes, but is not limited to, non-public information regarding Spectra's customers, marketing activities, technology, business plans and financial data. 'Non-Public' information means information that has not been published by the Company, or someone else, such as in a press release. Spectra considers any inappropriate release of Company confidential information to be a serious breach of Company policy and a violation of the law."

f.  "Computers, computer files, the e-mail system, and software furnished to employees are Spectra's property and intended for business use only. Accordingly, use becomes a Spectra use and any record of the use becomes Spectra's property subject to access and viewing by Spectra, and possible production to third parties. Employees have no right to privacy in any such use and may lose any right to privacy that may ordinarily apply to the balance of any records stored on a personal computer, smart phone, or cell phone."

g.  "The equipment, services, and technology provided to access the Internet always remain the property of Spectra."

h.  "Any Company-provided property shall be returned at [the time of an exit interview following resignation or termination]."

i.  "Whether a separation is voluntary or involuntary there are certain steps that will be taken: . . . Return of all Company property including keys, fob, computer equipment, smart/cell phones, all proprietary material, and any other Company property."

70.  Breaches of the policies in the employee handbook, including those set forth above, constitute breaches of each Defendant's Employment Agreement.

## IV.  When conducting an audit of its financials, Spectra discovered Arrigo Sr.'s violations of representations and warranties in the Equity and Asset Purchase Agreement

71.  In or around May 2022, Spectra began working with an outside auditor to conduct an audit of its financial statements.

16

72.     The auditor raised questions, leading Spectra to discover that Old Spectra had improperly accelerated revenue on its balance sheets and profit and loss statements using a revenue recognition practice that was not consistent with GAAP.

73.     Old Spectra engaged in this improper revenue recognition practice at Arrigo Sr.'s direction. Arrigo Sr., with Turriza's assistance, routinely identified certain future shipments of Old Spectra's goods and instructed Old Spectra employees to send those goods to customers far in advance of the dates on which its customers wanted, needed, or requested those goods. Arrigo Sr. then instructed Old Spectra's employees to record the revenue associated with those goods as revenue earned on or around the date of the shipment.

74.     Spectra's analysis of the effect of Old Spectra's revenue recognition practices on, without limitation, Old Spectra's EBITDA, and, ultimately, on the purchase price under the EAPA, is ongoing. Old Spectra's revenue recognition practices resulted in a purchase price under the EAPA that was materially higher than the purchase price that would have resulted had Old Spectra's revenue recognition practices been GAAP compliant, as represented. The accelerated revenue recognition also falsely presented that Old Spectra's business was growing more quickly than it was and that Old Spectra was meeting (or coming close to meeting) the revenue projections provided to the buyer, when it was not doing so.

75.     Spectra's overpayment improperly enriched Arrigo Sr., an owner of Old Spectra.

76.     Old Spectra's misrepresented financial performance was the key inducement for the purchase of Old Spectra for a value of $128 million. Arrigo Sr. and Old Spectra concealed that they had used improper revenue recognition practices resulting in an overstatement of Old Spectra's financial performance.

77.    As CEO of Spectra following execution of the EAPA, Arrigo Sr. never informed Spectra that Old Spectra's representations and warranties about its financial statements were false, nor did he inform Spectra that its financial statements were not compliant with GAAP or that Old Spectra had improperly inflated its, without limitation, EBITDA, and, therefore, the purchase price under the EAPA, using improper revenue recognition practices.

78.    Spectra's claims for Arrigo Sr.'s and Old Spectra's fraudulent inducement and willful, reckless, and negligent misrepresentations in connection with the EAPA, as discussed above, are subject to a Delaware forum selection clause and so are not raised as claims in this Complaint. Spectra outlines this misconduct as necessary context for Defendants' later conspiracy to destroy and/or conceal Spectra's documents and data to prevent Spectra from discovering or obtaining evidence of Defendants' misconduct, including Arrigo Sr.'s fraud in connection with the EAPA.

**V.    Arrigo Sr., Arrigo Jr., and Turriza are violating, and intend to continue to violate and further violate, their restrictive covenants and have stolen Spectra's trade secrets**

79.    Permanently deleting an email from a user's Outlook account entails several steps. First, a user may move an email from any folder (such as the Inbox) to the Deleted Items box. An email in the Deleted Items box is recoverable by moving the email back to the Inbox or other folder from which it came. At Spectra, items generally remain in the Deleted Items box unless the user performs a "soft delete" by either "emptying" the Deleted Items box or otherwise moving items from the Deleted Items box to the Recoverable Items box. Emails in the Recoverable Items box at Spectra remain for 30 days or until the user deletes emails from it (a "hard delete"). If a user performs a hard delete on an email, it is marked for permanent deletion from the account, which occurs on a periodic basis.

80.     Defendants began their scheme to hide evidence of their wrongdoing around the time that Arrigo Sr. resigned as CEO, if not earlier. Beginning on June 12, 2022, Arrigo Jr. began deleting a large volume of emails from his company email account. Between June 12 and July 6, 2022, Arrigo Jr. deleted approximately 24,000 items from the Deleted Items box to the Recoverable Items box (a "soft delete"), and he deleted approximately 60 items from the Recoverable Items box (a "hard delete"). This total volume of deletions far exceeded the volume of deletions Arrigo Jr. undertook in the ordinary course of his employment. Arrigo Jr. deleted these emails in bad faith and with intent to deprive Spectra of its property, and not for any legitimate business purpose. Arrigo Jr. had already downloaded data from his company Outlook account to an external hard drive by the time he began deleting the contents of his Outlook account en masse.

81.     Turriza likewise sought to perform mass deletions of his company emails during this period, beginning on June 13, 2022. Between June 13 and June 22, 2022, Turriza moved approximately 800items from his company Outlook account to the Deleted Items box, performed a soft delete on approximately 44,000 items, and performed a hard delete on approximately 51,000 items. This volume of deletions far exceeded the volume of deletions Turriza undertook in the ordinary course of his employment. Turriza continued to delete, soft delete, and hard delete items—several thousand in total—from his Outlook throughout July and August 2022. Turriza deleted these emails in bad faith and with intent to deprive Spectra of its property, and not for any legitimate business purpose.

82.     On July 15, 2022 (Arrigo Jr.'s last day as a Spectra employee), Spectra restricted the Arrigos from accessing their company Outlook accounts and placed a litigation hold on those accounts that retained all data stored on those accounts. On or about this day, Spectra's IT manager

changed the passwords to the Arrigos' company IT accounts to prevent their unauthorized access to Spectra's data on Spectra's network.

83.     Arrigo Sr. and Jr. still had possession of their company computers as of July 15, 2022. Because the computers were not connected to Spectra's network, Spectra's IT manager could not change the passwords to log into the computers. Therefore, even after July 15, 2022, Arrigo Sr. and Jr. could use their old passwords to access locally saved files on their company-owned computers.

84.     On July 18, 2022, Arrigo Jr. used his company computer to access a file called "Customer by State.xlsb," which he accessed from an external hard drive.

85.     On or around July 20, 2022, Arrigo Sr. and Jr. each signed a document stating that they had returned or destroyed all Spectra property, including documents, in their possession. In these statements, they acknowledged that any breach of these declarations would entitle Spectra to injunctive relief and to recover attorney's fees and litigation expenses incurred in any action to enforce Spectra's rights.

86.     These signed statements were false. On July 24, 2022, for instance, after the end of his employment, Arrigo Jr. used his company computer to view files titled "Final Price List 5-10-2022.xlsx," a spreadsheet that contains detailed sales and pricing information with respect to Spectra's products, and "Pipeline.xlsx," a spreadsheet that provides a roadmap to Spectra's future sales opportunities. Along with the file named "Customer by State.xlsb" that Arrigo Jr. copied onto an external hard drive, these three files provide Defendants with information sufficient to identify Spectra's current customers, obtain detailed information about Spectra's potential future customers and opportunities, and beat Spectra's prices, all in connection with their operation of a

competing business. The information on these files would not be useful for any purpose other than operating a competing business.

87.     The Final Price List Excel sheet was the result of a confidential pricing analysis conducted by an independent consultant that Spectra hired to perform a comprehensive, strategic assessment of its customer pricing and make pricing recommendations. Spectra paid approximately $500,000 for the confidential pricing analysis that culminated in this document.

88.     Turriza has failed to return to Spectra at least two external storage devices that have been connected to his company computer. Upon information and belief, those external storage devices contain Spectra's confidential information and trade secrets.

89.     Upon information and belief, Turriza has sought employment (or other service relationship) with Arrigo Sr., Arrigo Jr., and/or Arrigo Medical, intends to seek such employment (or other service relationship), or has already begun such employment (or other service relationship). Upon information and belief, the Arrigos have solicited Turriza to work for them and/or Arrigo Medical, either directly or through a consulting arrangement.

90.     Turriza's employment by (or services provided to) a competing business, such as Arrigo Medical, is a breach of the non-compete clause in Section 12 of his Employment Agreement. Likewise, the Arrigos' solicitation of Turriza violates the restrictive covenants in Section 11 of their respective Employment Agreements.

91.     Upon information and belief, Turriza took substantial steps toward his new business endeavor with the Arrigos while still a Spectra employee. Turriza's website history on the company computer issued to him indicates that, on September 20, 2022, he created a website (www.stellaconsultingllc.com) and used an online service to begin the paperwork to form a limited liability company called Stella Consulting LLC. Turriza officially formed Stella Consulting on

October 3, 2022, the week after his termination from Spectra. Turriza is Stella Consulting's sole member. According to records filed with the New Hampshire Secretary of State, Stella Consulting's "principal purpose" is "OTHER / Quality, Regulatory, R&D Consulting Services."

92.     Between the last day of Arrigo Sr.'s employment at Spectra and August 29, 2022, Turriza and Arrigo Sr. placed dozens of phone calls to one another (many during Turriza's work hours at Spectra), as did Turriza and Arrigo Jr. Upon information and belief, Defendants discussed during these calls their scheme to operate a competing business and their plans to destroy Spectra's property to hide evidence of their wrongdoing.

93.     Upon information and belief, Turriza and the Arrigos additionally discussed during these calls their scheme—which Defendants ultimately executed on August 29, 2022, as discussed below—whereby Turriza would improperly gain access to Arrigo Sr.'s company Outlook account to delete emails to conceal evidence of Defendants' wrongdoing.

94.     After August 30, 2022, Turriza continued phone contact with the Arrigos, including five calls Turriza placed to Arrigo Sr. while Turriza was in South Korea between September 17, 2022, and September 22, 2022, during a trip to conduct Spectra business. Upon information and belief, Turriza spent part of his time in South Korea meeting with key Spectra contacts and others regarding Defendants' new competing business.

95.     Upon information and belief, Defendants have contacted Spectra's customers, vendors, suppliers, and employees in connection with their operation of or employment by Arrigo Medical and/or any other competing business in an effort to divert business and employees from Spectra to their competing business. Defendants' solicitation of Spectra's customers, vendors, suppliers, and employees violates, among other things, their respective Employment Agreements and, in the case of Turriza, the STBA.

## VI. Defendants conspired to delete company data, documents, and communications to hide evidence of their misconduct

96.     On July 19, 2022, four days after Arrigo Jr.'s last day at Spectra, Turriza requested that Spectra's IT director provide him with access to Arrigo Jr.'s Outlook account. Presuming that Turriza would use such access to monitor any incoming emails from customers and that Turriza was acting for Spectra's interests, Spectra's current CEO authorized Turriza to access the account.

97.     Beginning on or about July 19, 2022, and continuing until on or about September 26, 2022, Turriza accessed Arrigo Jr.'s Outlook account on a daily or near-daily basis. During that span, Turriza performed a soft delete on approximately 1,000 items and a hard delete on approximately 700 items in Arrigo Jr.'s Outlook account. By performing soft deletes and then hard deletes on items in Arrigo Jr.'s Outlook account, Turriza sought to permanently delete those items from the account and to conceal those items from Spectra.

98.     Spectra did not authorize Turriza to delete documents, data, or communications stored on Arrigo Jr.'s Outlook account. Turriza did not consult with anyone at Spectra about deleting items from Arrigo Jr.'s Outlook account. Turriza deleted these emails in bad faith and with the intent to deprive Spectra of its property, and not for any legitimate business purpose.

99.     Among the emails Turriza attempted to delete from his own company Outlook account is an August 16, 2022, email from "adobesign@adobesign.com" to Turriza with a subject line indicating that an agreement was "sent out for signature to anthony@arrigomedical.com." This email contains as an attachment a document titled Confidential Disclosure Agreement. The Confidential Disclosure Agreement is between Arrigo Medical and one of Spectra's largest customers, and "Anthony Arrigo" is listed as "Co-Founder" and signatory for Arrigo Medical. The stated purpose of the Confidential Disclosure Agreement is "[t]o evaluate the potential business opportunity of entering into an agreement or other business relationship between [Arrigo Medical]

23

and [Spectra's customer] regarding quotations for potential [customer] business including *but not limited* to guidewires."[6] (Emphasis added.) Spectra has manufactured and sold limited quantities of guidewires, including sales of Spectra-manufactured guidewires as recently as May 2022.

100.    Upon information and belief, Defendants do not intend to limit any new business venture of theirs to guidewires. If they did, there would have been no reason for Arrigo Jr. to steal Spectra's detailed pricing information or information about Spectra's pipeline opportunities, as neither of these contain information about guidewires. Regardless, Defendants' Employment Agreements prohibit them from using Spectra's Confidential Information for any purpose other than for Spectra's benefit. Defendants' use of Spectra's Confidential Information for *any* business venture of theirs violates their Employment Agreements.

101.    Furthermore, Arrigo Jr. had just a month before this Confidential Disclosure Agreement regarding the sale of guidewires by Arrigo Medical—while he was still a Spectra employee—refused to provide a quotation on behalf of Spectra to this same customer for an order of guidewires. In an email dated July 11, 2022, Arrigo Jr. told such customer's representative that Spectra would not be able to provide a quotation on an order of guidewires because Spectra was "not currently set up to run guidewires." The customer's representative wrote back, apparently confused, pointing out that he and Arrigo Jr. had discussed "face to face during [a trade show Arrigo Jr. attended on Spectra's behalf in April 2022] the prospect of providing guidewires to [customer]. I don't believe you had the capability at the time *but were exploring it. Does Spectra still have plans to get into the guidewire space?*" (Emphasis added.) Thus, Arrigo Jr. deliberately turned down a business opportunity on Spectra's behalf—even though he knew Spectra was

---

[6]       A guidewire is a medical device used to guide a catheter during a central venous catheter ("CVC") insertion. Guidewires are inserted into the body by putting them into hollow needles called "guidewire introducer needles." Spectra manufactures and sells guidewire introducer needles as a major product line.

working toward entering the market for guidewires—and shortly thereafter left Spectra and signed a non-disclosure agreement (which references guidewires) on behalf of Arrigo Medical with the very customer Arrigo Jr. diverted from Spectra while a Spectra employee.

102.    Turriza moved this email and attachment to the Deleted Items box of his company email on August 16, 2022, and performed a hard delete on August 18, 2022. Turriza was Spectra's employee during these times.

103.    In connection with Spectra's audit and its discovery of Old Spectra's failure to recognize its revenue in compliance with GAAP, Spectra sent Arrigo Sr. an Indemnification Letter on August 18, 2022, in accordance with the EAPA's indemnification procedures. The Indemnification Letter informed Arrigo Sr. that Spectra was likely to incur indemnifiable losses caused by Old Spectra's violations of the representations and warranties set forth in the EAPA relating to the accuracy and GAAP compliance of Old Spectra's financial statements. The Indemnification Letter contained a Preservation Notice that required Arrigo Sr. to retain and preserve all documents, data, or other items related to Spectra and/or Old Spectra's revenue recognition practices.

104.    Between August 18 and 28, 2022, Turriza and Arrigo Sr. had numerous phone conversations. Turriza had no reason related to Spectra's business to speak with Arrigo Sr. during this period.

105.    On August 25, 2022, Turriza asked Spectra's IT manager for Arrigo Jr.'s computer password. The IT manager provided Turriza with the new password that he had created on July 15, 2022, for Arrigo Jr.'s account.

106.    On August 28, 2022, Turriza called Arrigo Sr. two times. The phone calls lasted approximately 2 and 14 minutes. Upon information and belief, the two discussed their plan that,

the following day, Turriza would access Arrigo Sr.'s company Outlook account to delete emails

and other data that Arrigo Sr. was required to retain and preserve under the Preservation Notice,

as well as other data that would reveal evidence of Defendants' theft of Spectra's trade secrets and

violations of their restrictive covenants.

107.    On August 29, 2022, Turriza requested that Spectra's IT manager provide him with

Arrigo Sr.'s Outlook password. Turriza told the IT manager that he needed to access Arrigo Sr.'s

Outlook account to find a document pertaining to Arrigo Sr.'s personal health benefits that Arrigo

Sr. had been trying to acquire from Spectra since he resigned from the company. Relying upon the

truth of Turriza's representation and on Turriza's role as a trusted and high-level Spectra executive,

the IT manager provided Turriza with the new account password at approximately 12:53 pm ET

on August 29, 2022.

108.    Within approximately two minutes of receiving the password, Turriza accessed

Arrigo Sr.'s Outlook account and immediately began deleting emails and other data and continued

such deletions over the period from approximately 12:55 pm to 3:02 pm ET. During this time,

Turriza deleted approximately 27,000 items from Arrigo Sr.'s Outlook account. Turriza

deliberately performed a three-step process (move to Deleted Items box, soft delete, hard delete)

to attempt to permanently purge from Arrigo Sr.'s Outlook account thousands of items.

109.    Many of the emails Turriza moved to the Deleted Items box, soft deleted, and/or

hard deleted were spam messages and/or unrelated to Spectra's business. A substantial number of

those emails, however, *were* business-related, and such emails spanned a significant time period,

from early 2018 through August 2022. Upon information and belief, Turriza deleted spam and

non-business emails in an attempt to obscure the fact that he also deleted business-related emails

and important evidence of misconduct. In addition to received emails, Turriza also deleted numerous emails sent by Arrigo Sr. and saved contacts.

110.    Among the emails Turriza deleted from Arrigo Sr.'s Outlook account are emails that evidence Defendants' misconduct, including, without limitation, the foregoing:

a.  An email dated October 13, 2020, discussing the need to "pull[] in sale orders through 1/30/21" in order to meet that month's revenue goal. This email is evidence of Old Spectra's improper revenue recognition practices. Arrigo Sr. was in active discussions to sell Old Spectra during this time and had provided sales and revenue projections.

b.  An email sent from Arrigo Sr. to an employee from one of Spectra's significant customers. On July 6, 2022, the customer's employee emailed Arrigo Sr. (who goes by Tony) stating, "Hi Tony, I was speaking to Anthony today & he mentioned you were leaving Spectra. I am sorry to hear you are leaving, it was great to meet you a few months ago & I have enjoyed working with you and Anthony. ***Give me a shout when you are up & running on your new venture, we'd love to hear more about it***. Thank you & best of luck!" (Emphasis added). Arrigo Sr. responded the same day: "Thank you[]! We will be in touch. Tony." This email exchange occurred while Arrigo Jr. (who goes by Anthony) was still employed by Spectra.

c.  An email on June 14, 2022, from Arrigo Sr. to a CitiBank employee regarding a loan for Arrigo Sr.'s new medical device company, as well as subsequent emails in which Arrigo Sr. and the employee agreed to speak the following morning. Arrigo Sr. bcc'd Arrigo Jr. and Eddie Arrigo on the email. This email was also deleted from Arrigo Jr.'s Outlook account. Arrigo Sr. and Arrigo Jr. were both still employed by Spectra at the time of this email.

d.  Several emails Arrigo Sr. sent to himself that included the phrase "Arrigo Medical" in the subject line.

e.  Emails relating to the EAPA and negotiation of the sale of Old Spectra.

f.  Emails sent from Arrigo Sr. to Turriza with a time of day in the subject line and no content in the body, sent during the week before Arrigo Sr. provided his notice of resignation to Spectra. Upon information and belief, Arrigo Sr. and Turriza communicated in this fashion to set times of meetings with each other and/or with Spectra's customers, vendors, or suppliers to discuss their competing business venture. Such emails were responded to by Turriza with acknowledgments.

g.  Emails that appear to address other issues bearing on the sale of Old Spectra's assets that were not disclosed in the EAPA and would constitute additional breaches of the representations and warranties in the EAPA.

h.  Hundreds of travel related emails which reflect Arrigo Sr.'s whereabouts and activities, including that he traveled to South Korea in August 2022. Upon information and belief, Arrigo Sr. traveled to South Korea in August 2022 to meet with key Spectra contacts or others in connection with Defendants' operation of a competing business.

111.    While he was deleting emails from Arrigo Sr.'s Outlook account on August 29, 2022, Turriza spoke to Arrigo Jr. on the phone from approximately 1:22 pm to 1:39 pm ET. During this period, Turriza moved to the Deleted Items box and/or performed a soft delete on several thousand emails in Arrigo Sr.'s Outlook account. Upon information and belief, Arrigo Jr. provided instructions to Turriza regarding what emails to delete and/or on where and how to find incriminating emails so Turriza could delete them.

112.    Turriza also spoke to Arrigo Sr. on the phone while he was deleting emails on Arrigo Sr.'s account on August 29, 2022, including for 10 minutes beginning at 2:41 pm ET and for 8 minutes beginning at 2:53 pm ET. For the duration of these calls, Turriza was deleting emails from Arrigo Sr.'s Outlook account. During the call beginning at 2:41 pm ET, Turriza moved at least 60 emails to the Deleted Box, most of which were business-related and the majority of which had been in Arrigo Sr.'s Sent Items box. Turriza's second call with Arrigo Sr. ended at approximately 3:01 pm ET, and Turriza finished deleting emails from Arrigo Sr.'s account one minute later. Clearly, Arrigo Sr. and Turriza discussed on these calls their scheme to destroy evidence, and Arrigo Sr. directed and instructed Turriza as to which emails to delete and where and how to find incriminating emails so Turriza could delete them.

113.    Spectra did not authorize Turriza to delete documents, data, or communications stored on Arrigo Sr.'s company Outlook account. Turriza did not consult with anyone at Spectra about deleting items from Arrigo Sr.'s Outlook account.

114.    Turriza falsely claimed that he needed access to the account in order to search for and send a document pertaining to Arrigo Sr.'s health benefits. But Turriza did not send any data, documents, or communications stored in Arrigo Sr.'s company Outlook, including any documents pertaining to health benefits.

115.    But for a litigation hold that Spectra had placed on the Arrigos' Outlook accounts—of which Defendants were not aware—Defendants likely would have succeeded in their scheme to conceal those emails and hide that evidence from Spectra.

116.    The emails that Defendants conspired to delete are Spectra's property, and many of them contained Spectra's confidential information and or trade secrets. Defendants intended to harm Spectra by deleting these emails.

117.    Upon leaving Spectra, Arrigo Sr. and Jr. did not return their company-issued laptop computers. Both computers are Spectra's property, and the Arrigos were required to return them under their respective Employment Agreements and Spectra's employee handbook. Spectra made repeated written demands for the return of the computers. Arrigo Sr. and Jr. failed to comply with these demands until September 14, 2022, and September 7, 2022, respectively.

118.    Thereafter, Spectra learned through a digital forensic evaluation that new operating systems had been installed on the computers on September 12, 2022, and August 30, 2022, respectively. The result of installing new operating systems was to delete data stored on the computers. One or more of the Defendants destroyed data on the two company computers to prevent Spectra from uncovering evidence of their wrongdoing. Spectra has been unable to recover a large portion of the data on those computers.

## VII.    During Spectra's investigation into Turriza's deletions, Turriza permanently deleted all data from his company phone in a further effort to hide evidence

119.    In August 2022, Spectra's IT director noticed a substantial reduction in the storage space used by Arrigo Jr.'s Outlook account. The IT director deduced that someone had deleted a large number of emails from the account.

120.    Thereafter, Spectra began investigating the manner and reasons for the deletion of emails from Arrigo Jr.'s Outlook account.

121.    During Spectra's investigation, it learned of Turriza's involvement. Spectra also learned during the investigation about Turriza's deletions of tens of thousands of emails from Arrigo Sr.'s Outlook account on August 29, 2022.

122.    On September 26, 2022, as part of its investigation Spectra interviewed Turriza regarding his deletion of company data, documents, and communications. Also on that date, Spectra suspended Turriza's employment.

123.    Following the interview, Turriza was instructed to return the company cell phone issued to him. Spectra provided and paid for the cell phone, and it is Spectra's property. Turriza knew, including by reason of the employee handbook, that the cell phone was Spectra's property and that he had no right to privacy for any data contained on the phone.

124.    When he received the instruction to return his company-owned cell phone, Turriza resisted turning over his phone and immediately started deleting data from the phone in the presence of Spectra representatives.

125.    Spectra representatives instructed Turriza to stop deleting data from his phone and to return it. They advised him that the phone and its data were company property and that he was not permitted to delete any data from the phone. Instead, Turriza executed a factory reset of the phone during this discussion before turning it over to Spectra. The factory reset permanently deleted from the phone all of the user-created data stored thereon.

126.    Spectra has been unable to recover the data from Turriza's company cell phone through digital forensic efforts.

127.    Later that day, Spectra's counsel sent Turriza a letter on Spectra's behalf, instructing him not to delete any backup of the iPhone data that may exist or any other information or documents that are Spectra's property.

128.    The following day, Turriza attempted to buy a new $1,500 iPhone using a company account.

129.    Because of Turriza's misconduct in violation of his Employment Agreement and law, Spectra terminated his employment for cause on September 29, 2022, in accordance with Section 9 of his Employment Agreement.

130. Turriza's conduct resulting in his termination was materially injurious to Spectra within the meaning of Section 9 of his Employment Agreement.

131. Turriza's conduct resulting in his termination was not curable within the meaning of Section 9 of his Employment Agreement.

132. On September 29, 2022, Turriza received written notice of his termination. The notice instructed him to return to Spectra its property in his possession and that he could not delete or destroy any of Spectra's data or property.

133. Thereafter, Turriza returned to Spectra certain property, including the company iPad tablet issued to him. In complete disregard of Spectra's written instructions that he was not authorized to delete any of Spectra's data, Turriza conducted a factory reset of the iPad before returning it. Spectra has been unable to recover the data stored on the iPad through digital forensic efforts.

134. A backup of the data on Turriza's phone and iPad may exist on Apple's iCloud or in some other backup location. Spectra cannot access any Apple backup because Turriza linked the phone and iPad to his personal Apple account, to which Spectra does not have access. Spectra has instructed Turriza to not delete or otherwise tamper with any iCloud or other backup.

135. Turriza has the current ability to delete any iCloud or other backup of the data on his phone and iPad that may exist.

136. If Turriza deletes existing backups of the cell phone and iPad data, then that data will be permanently lost.

**ADVERSE INFERENCE**

137. As described in this Complaint, all three Defendants have taken steps to destroy Spectra's property in an effort to hide evidence of their misconduct. Defendants' efforts in this

regard have been coordinated, deliberate, systematic, and with full understanding and knowledge of the wrongfulness of their actions.

138.    Defendants' deletion of documents was successful in several respects, including, without limitation, by deleting all of the data from Turriza's cell phone and iPad and by deleting data from the Arrigos' company computers before returning them to Spectra.

139.    At all times, Defendants were on notice that their conduct in deleting and attempting to delete Spectra's data was wrongful and injurious to Spectra's property and business interests, including, without limitation, because their respective Employment Agreements and the employee handbook expressly prohibited such conduct. They also, as of August 18, 2022, had notice of the Indemnification Letter and the Preservation Notice attached thereto. And Turriza received clear instructions not to delete data from his company cell phone, as well as two subsequent written communications instructing him not to delete any company data—after which he deleted all data on his company-owned iPad.

140.    At all times relevant to this complaint, Defendants knew they were violating and/or intending to violate their restrictive covenants; knew they were misappropriating and/or intending to misappropriate Spectra's trade secrets; and knew of other misconduct in the sale of Old Spectra. Defendants knew and specifically intended that their deletion of data would deprive Spectra of the use of such data in litigation over Defendants' misconduct.

141.    Spectra is entitled to adverse inferences regarding the content of the data, documents, and communications Defendants destroyed. For example, and without limitation, Spectra is entitled to adverse inferences that the deleted data contains evidence of: (1) Old Spectra's improper revenue recognition practices; (2) Defendants' breaches and intended breaches

of the restrictive covenants to which they are bound; (3) Defendants' theft of Spectra's trade secrets; and (4) Defendants' conspiracy to destroy Spectra's property in order to hide evidence.

## CLAIMS FOR RELIEF

### First Claim for Relief: Misappropriation of Trade Secrets Under G.L. 93, § 42A
### (All Defendants)

142.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

143.    Between July 18 and 24, 2022—after he no longer worked for Spectra—Arrigo Jr. accessed files on his company owned-computer titled "Pipeline.xlsx" and "Final Price List 5-10-2022.xlsx," and "Customer by State.xlsb." Arrigo Jr. also downloaded a filed called "Emails.pst" containing 2.8 gigabytes of data from his company Outlook account. These files included Spectra's trade secrets. Arrigo Jr. also copied "Customer by State.xlsb" and "Emails.pst" onto an external hard drive on or before July 18, 2022. Turriza has failed to return at least two external storage devices that he connected to his company-issued computer. Upon information and belief, Defendants have stolen other of Spectra's trade secrets.

144.    Arrigo Jr. was not a Spectra employee when he viewed these files, and he had no right to possess or access them.

145.    Upon information and belief, Arrigo Jr. copied and shared these files with Arrigo Sr., Turriza, and/or Arrigo Medical as part of their scheme to compete with Spectra. These files contain information sufficient to identify Spectra's current and potential customers, determine the needs of those customers and potential customers, undercut Spectra's pricing, and build the infrastructure of a competing business.

146.    Defendants have thus misappropriated Spectra's trade secrets and threatened to misappropriate Spectra's trade secrets.

147.    Spectra took reasonable steps to protect its trade secrets, including, without limitation, by securing access to its IT systems, limiting access to its data on a need-to-know basis, changing the passwords of former employees, demanding the immediate return of company property upon separation, and having Arrigo Sr. and Arrigo Jr. execute written statements under penalty of perjury that all company materials had been returned or destroyed.

148.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

149.    Defendants' misappropriation and threatened misappropriation of Spectra's trade secrets was willful and malicious such that Spectra is entitled to double damages under G.L. 93, § 42B(b).

150.    Spectra has suffered actual loss by the misappropriation and/or threatened misappropriation, or, in the alternative, Spectra is entitled to a reasonable royalty for Defendants' unauthorized disclosure and use of Spectra's trade secrets.

151.    Upon information and belief, Defendants have unjustly enriched themselves by Defendants' misappropriation of Spectra's trade secrets.

**Second Claim for Relief: Defend Trade Secrets Act, 18 U.S.C. § 1836
(All Defendants)**

152.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

153.    Between July 18 and 24, 2022—after he no longer worked for Spectra—Arrigo Jr. accessed files on his company owned-computer titled "Pipeline.xlsx" and "Final Price List 5-10-2022.xlsx," and "Customer by State.xlsb." Arrigo Jr. also downloaded a filed called "Emails.pst" containing 2.8 gigabytes of data from his company Outlook account. These files included Spectra's trade secrets. Arrigo Jr. also copied "Customer by State.xlsb" and "Emails.pst" onto an external hard drive on or before July 18, 2022. Turriza has failed to return at least two external storage devices that he connected to his company-issued computer. Upon information and belief, Defendants have stolen other of Spectra's trade secrets.

154.    Upon information and belief, Arrigo Jr. and Turriza shared these files with Defendants as part of their scheme to compete with Spectra. These files contain information sufficient to identify Spectra's current and potential customers, determine the needs of those customers and potential customers, undercut Spectra's pricing, and build the infrastructure of a competing business.

155.    The trade secrets Defendants have misappropriated are related to products and services used in, or intended for use in, interstate or foreign commerce.

156.    Spectra took reasonable steps to protect its trade secrets, including, without limitation, by securing access to its IT systems, limiting access to its data on a need-to-know basis, changing the passwords of former employees, demanding the immediate return of company property upon separation, and having Arrigo Sr. and Arrigo Jr. execute written statements under penalty of perjury that all company materials had been returned or destroyed.

157.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue

to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

158.    Defendants' misappropriation and threatened misappropriation of Spectra's trade secrets was willful and malicious such that Spectra is entitled to double damages under 18 U.S.C. § 1836(b)(3)(C).

159.    Spectra has suffered actual loss by the misappropriation and/or threatened misappropriation, or, in the alternative, Spectra is entitled to a reasonable royalty for Defendants' unauthorized disclosure and use of Spectra's trade secrets.

160.    Upon information and belief, Defendants have unjustly enriched themselves by Defendants' misappropriation of Spectra's trade secrets.

**Third Claim for Relief: Civil Conspiracy**
**(All Defendants)**

161.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

162.    As set forth in this Complaint, Defendants have combined to accomplish unlawful means including, without limitation, to convert and/or destroy Spectra's property, steal Spectra's trade secrets, defraud Spectra, breach their respective duties of loyalty and fiduciary duties to Spectra, gain unauthorized access to Spectra's computers, cause unauthorized damage to Spectra's computers, engage in unfair and deceptive trade practices, and interfere with Spectra's contractual relations.

163.    The above-described wrongful conduct was done as part of a concerted and coordinated effort by Defendants to steal Spectra's trade secrets, violate restrictive covenants, and destroy Spectra's property to hide evidence of their wrongdoing.

164.    Each Defendant is liable for all the acts committed in furtherance of Defendants' unlawful conspiracy.

165.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

166.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

### Fourth Claim for Relief: Fraud
### (Arrigo Sr., Arrigo Jr., and Turriza)

167.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

168.    Turriza misrepresented to Spectra his purpose for accessing Arrigo Sr.'s Outlook account. Turriza told Spectra's IT manager that he had a benign purpose for accessing the account when, in fact, he intended to use such access to delete, destroy, and/or conceal Spectra's property in furtherance of the conspiracy.

169.    Turriza knew when he made these representations that his stated reason for accessing the account was false.

170.    Turriza intended that Spectra rely on his misrepresentations in granting him access to Arrigo Sr.'s Outlook account.

171.    Turriza's misrepresentations were material, in that the IT manager would not have granted him access to the Outlook accounts if he had known Turriza's true purpose.

172.    In entering into their Employment Agreements, Defendants misrepresented to Spectra that they intended to abide by the restrictive covenants contained in those agreements.

173.    Following their respective separations from Spectra, Arrigo Sr. and Jr. misrepresented to Spectra that they had complied and would continue to comply with all provisions of their respective Employment Agreements, including that they would not destroy, copy, or otherwise take Spectra's confidential information. Arrigo Sr. and Jr. also misrepresented to Spectra that, as of July 20, 2022, they had returned or destroyed all of Spectra's property that had been in their possession.

174.    Arrigo Sr. and Jr. both knew when they made these representations that they were false.

175.    Arrigo Sr. and Jr. both intended Spectra to rely on these representations.

176.    Their misrepresentations were material in that Spectra would have, among other things, taken further steps to protect its property and business interests if the Arrigos had disclosed their violations of restrictive covenants, their intent to violate the restrictive covenants, and their copying and destruction of Spectra's property.

177.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

178.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

**Fifth Claim for Relief: Breach of Duty of Loyalty**
**(Arrigo Sr., Arrigo Jr., and Turriza)**

179.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

180.    As senior and high-ranking Spectra executives, each Defendant held a position of trust and confidence at Spectra.

181.    Each Defendant owed Spectra a duty of loyalty.

182.    Defendants' actions as set forth in this Complaint constitute breaches of the duty of loyalty.

183.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

184.    Through their disloyal conduct, Arrigo Sr., Arrigo Jr., and Turriza have forfeited their right to retain their compensation. Spectra is entitled to damages, in amounts to be determined, for repayment of Defendants' compensation during the periods in which they were in violation of their fiduciary duties.

185.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

**Sixth Claim for Relief: Aiding and Abetting Breach of Duty of Loyalty**
**(Arrigo Sr.)**

186.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

187.    At all times relevant to this Complaint, Arrigo Sr. was aware that Arrigo Jr. and Turriza were key Spectra employees entrusted by Spectra with its confidential information and trade secrets, including, not limited to, information about Spectra's business strategies, customers, and pricing. Arrigo Sr. was aware that Arrigo Jr. and Turriza owed Spectra a duty of loyalty arising out of the employment relationship between them and Spectra.

188.    41.    Upon information and belief, Arrigo Sr. substantially assisted, encouraged and otherwise knowingly and willfully aided and abetted Arrigo Jr.'s and Turriza's breaches of their fiduciary duties as alleged in this Complaint, including but not limited to by encouraging and inducing them to solicit Spectra's customers, vendors, suppliers, and/or employees; and by encouraging them to misappropriate Spectra's confidential information and trade secrets.

189.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

190.    Arrigo Sr.'s actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

### Seventh Claim for Relief: Conversion
### (Arrigo Sr., Arrigo Jr., and Turriza)

191.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

192.    Defendants intentionally and wrongfully destroyed Spectra's property, including, without limitation, the data on Turriza's company cell phone and iPad, the data in their company Outlook accounts, and data stored on the Arrigos' company-issued computers.

193.    At the time Defendants intentionally and wrongfully destroyed Spectra's property, Spectra was entitled to immediate possession of that property.

194.    Defendants' intentional and wrongful conduct has dispossessed Spectra of its property.

195.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

196.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

**Eighth Claim for Relief: Conversion**
**(All Defendants)**

197.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

198.    Defendants are currently in possession of Spectra's property, including, without limitation, hard copies of company documents, company documents and information contained on external storage devices, the data copied from Arrigo Jr.'s Outlook account, and upon information and belief, backup files of the data stored on Turriza's company-owned phone and iPad.

199.    Defendants are intentionally and wrongfully exercising ownership, control, and dominion over Spectra's documents over which they have no right of possession.

200.    Spectra has demanded that Defendants return to Spectra all of its property in their possession. Defendants have not complied with such requests.

201.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

202.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

**Ninth Claim for Relief: Unfair and Deceptive Trade Practices Under G.L. 93A, § 11**
**(All Defendants)**

203.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

204.    Spectra is engaged in the conduct of trade and commerce.

205.    Defendants are engaged in the conduct of trade and commerce.

206.    Defendants have engaged in unfair methods of competition and unfair and deceptive acts and practices as alleged in this Complaint.

207.    Spectra has suffered loss of money and property as a result of the use and employment by Defendants of unfair methods of competition and unfair and deceptive acts and practices.

208.    Defendants' breaches of contract as alleged in this Complaint were intentional breaches of known contractual duties. Defendants intended such breaches to secure benefits for them at Spectra's expense.

209.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

210.    Defendants' unfair methods of competition and unfair and deceptive acts and practices were willful and knowing, and they caused harm to Spectra such that Spectra is entitled to treble damages under G.L. 93A, § 11. Spectra also is entitled to attorney's fees and costs under G.L. 93A, § 11.

**Tenth Claim for Relief: Unauthorized Access and Damage to a Protected Computer Under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), (a)(5)(C)**
**(Arrigo Sr., Arrigo Jr., and Turriza)**

211.    Spectra re-alleges and incorporates herein by reference the allegations of all of the preceding Paragraphs of the Complaint.

212.    Upon information and belief, Arrigo Sr. and Jr. intentionally accessed their company-owned computers after leaving Spectra.

213.    The computers have moved in or otherwise affect interstate commerce.

214.    Arrigo Sr. and Jr. were not authorized to access the computers.

215.    Upon information and belief, through their unauthorized access, Arrigo Sr. and Jr. obtained information.

216.    As a result of such conduct, Arrigo Sr. and Jr. caused the impairment to the integrity and availability of data, a program, a system, and information on the computers.

217.    Arrigo Sr.'s and Jr.'s unauthorized accesses caused loss to Spectra during a one-year period aggregating at least $5,000 in value.

218.    After Spectra suspended his employment, Turriza intentionally accessed his company-owned cell phone and iPad.

219.    The cell phone and the iPad have moved in or otherwise affect interstate commerce.

220.    Turriza was not authorized to access those devices.

221.    As a result of Turriza's unauthorized access, he caused impairment to the integrity and availability of data, a program, a system, and information on the devices.

222.    Turriza's unauthorized access caused loss to Spectra during a one-year period aggregating at least $5,000 in value.

223.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

### Eleventh Claim for Relief: Breach of Contract
### (Turriza)

224.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

225.    The STBA dated August 30, 2021, by and between Old Spectra and Turriza is a valid contract supported by consideration. Old Spectra assigned its rights thereunder to Spectra upon execution of the EAPA.

226.    The Employment Agreement dated June 3, 2022, by and between Spectra and Turriza is a valid contract supported by consideration.

227.    The STBA expressly conditions Spectra's obligation to pay the Sale Transaction Bonus on Turriza's satisfactory performance of his services, including compliance with his Employment Contract.

228.    Spectra has at all times relevant to this Complaint been ready, willing, and able to perform its duties under the STBA and Turriza's Employment Agreement.

229.    As detailed throughout this Complaint, Turriza has committed multiple breaches of his employment contract, including but not limited to breaches of non-competition, non-solicitation, and confidentiality provisions and failure to comply with provisions of the employee handbook incorporated by reference into his Employment Agreement.

230.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

### Twelfth Claim for Relief: Breach of Implied Covenant of Good Faith and Fair Dealing
### (Turriza)

231.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

232.    In connection with the Sale Transaction Bonus Agreement and his Employment Agreement, Turriza gave Spectra an implied covenant of good faith and fair dealing.

233.    Turriza's actions as discussed in this Complaint violated the implied covenant of good faith and fair dealing.

234.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

### Thirteenth Claim for Relief: Breach of Contract
### (Arrigo Sr.)

235.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

236.    The Employment Agreement dated October 1, 2021, by and between Spectra and Arrigo Sr. is a valid contract supported by consideration.

237.    Spectra has at all times relevant to this Complaint been ready, willing, and able to perform its duties under the Employment Agreement.

238.    As detailed throughout this Complaint, Arrigo Sr. has committed multiple breaches of his employment contract, including but not limited to breaches of non-competition, non-solicitation, and confidentiality provisions and failure to comply with provisions of the employee handbook incorporated by reference into his Employment Agreement.

239.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

**Fourteenth Claim for Relief: Breach of Implied Covenant of Good Faith and Fair Dealing (Arrigo Sr.)**

240.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

241.    In connection with the Employment Agreement, Arrigo Sr. gave Spectra an implied covenant of good faith and fair dealing.

242.    Arrigo Sr.'s actions as discussed in this Complaint violated the implied covenant of good faith and fair dealing.

243.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage

to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

### Fifteenth Claim for Relief: Breach of Contract
### (Arrigo Jr.)

244.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

245.    The Employment Agreement dated October 1, 2021, by and between Spectra and Arrigo Jr. is a valid contract supported by consideration.

246.    Spectra has at all times relevant to this Complaint been ready, willing, and able to perform its duties under Arrigo Jr.'s Employment Agreement.

247.    As detailed throughout this Complaint, Arrigo Jr. has committed multiple breaches of his employment contract, including but not limited to breaches of non-competition, non-solicitation, and confidentiality provisions and failure to comply with provisions of the employee handbook incorporated by reference into his Employment Agreement.

248.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

**Sixteenth Claim for Relief: Breach of the Implied Covenant of**
**Good Faith and Fair Dealing**
**(Arrigo Jr.)**

249.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

250.    In connection with the Employment Agreement, Arrigo Jr. gave Spectra an implied covenant of good faith and fair dealing.

251.    Arrigo Jr.'s actions as discussed in this Complaint violated the implied covenant of good faith and fair dealing.

252.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

**Seventeenth Claim for Relief: Intentional Interference with Contractual Relations**
**(All Defendants)**

253.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

254.    Defendants have intentionally and wrongfully interfered with Spectra's contractual relationships with its customers by destroying, attempting to destroy, and conspiring to destroy Spectra's data, documents, and communications, including its communications with and about customers.

255.    Upon information and belief, Defendants have intentionally and wrongfully interfered with Spectra's contractual relationships with its customers, vendors, suppliers, and

employees, by attempting to solicit them to Defendants' competing business, as set forth in this Complaint.

256.    Defendants have no lawful or legitimate purpose for their conduct.

257.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

258.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

### Eighteenth Claim for Relief – Intentional Interference with Advantageous Prospective Contractual Relations (All Defendants)

259.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

260.    Spectra has prospective advantageous relations with customers, vendors, suppliers, and employees.

261.    As described in this Complaint, Defendants have knowingly induced the breaking of those relationships.

262.    Defendants' conduct in this regard was intentional and involved both improper motive and means.

263.    As a direct and proximate result of Defendants' misconduct, Spectra has suffered damages, including, without limitation: the loss and threatened loss of business and profit; damage

to good will; the loss of its data, documents, and communications, which has had and may continue to have an impact on Spectra's business; additional business expenses due to Defendants' misconduct; and the time and expense of recovering and attempting to recover its property, in amounts to be determined.

264.    Defendants' actions were committed knowingly, willfully, and in conscious disregard of Spectra's rights.  Accordingly, Spectra is also entitled to recover punitive damages in an amount to be determined.

### Nineteenth Claim for Relief – Injunctive Relief
### (All Defendants)

265.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

266.    The restrictive covenants in Arrigo Sr.'s, Arrigo Jr.'s, and Turriza's employment agreements, and Turriza's STBA, protect Spectra's legitimate business interests, including but not limited to its confidential information and trade secrets.

267.    Unless Defendants are preliminarily and permanently enjoined, Defendants will continue to engage in unfair competition with Spectra by continuing to use and/or disclose Spectra's confidential information and trade secrets, and by continuing to violate the restrictive covenants to which they are bound, which will result in irreparable harm to Spectra for which monetary damages would be an inadequate remedy. Spectra has no adequate remedy at law.

268.    Unless Defendants are preliminarily and permanently enjoined, Defendants will continue to wrongfully possess Spectra's property, including without limitation its trade secrets and confidential information, over which Defendants have no right of possession. Spectra's demands for the return of its property have not been met. Defendants' wrongful exercise of

ownership, dominion and control over Spectra's property causes Spectra irreparable harm for which monetary damages would be an inadequate remedy. Spectra has no adequate remedy at law.

269.    The economic harm being suffered by Spectra as a result of Defendants' breaches of the their restrictive covenants and wrongful possession of Spectra's property is unascertainable at this time and the future economic loss is presently incalculable. Further, the balance of harms in entering the injunction weigh in favor of Spectra as a result of the extreme prejudice resulting from Defendants' blatant contractual violations.

270.    The public interest will not be adversely affected by the entry of injunctive relief in this matter.

### Twentieth Claim for Relief: Declaratory Judgment
### (Arrigo Sr., Arrigo Jr., and Turriza)

271.    Spectra re-alleges and incorporates herein by reference the allegations in all of the preceding Paragraphs of the Complaint.

272.    Arrigo Sr., Arrigo Jr., and Turriza are all subject to provisions in their respective employment agreements—and, in the case of Turriza, the STBA—that prohibit them from (a) using or disclosing Spectra's confidential information, (b) owning, operating, managing being employed by, or otherwise providing services to a business that operates in competition with Spectra; and (c) soliciting Spectra's customers, suppliers, vendors, and employees.

273.    As described in this Complaint, Arrigo Sr., Arrigo Jr., and Turriza have threatened to and actually violated these confidentiality provisions and restrictive covenants.

274.    Spectra is entitled a declaratory judgment that these confidentiality provisions and restrictive covenants are valid and enforceable.

### PRAYER FOR RELIEF

WHEREFORE, Spectra prays for judgment in its favor and requests relief as follows:

- Damages in an amount to be determined at trial;

- Treble damages pursuant to G.L. 93A, § 11;

- Double damages pursuant to G.L. 93, § 42B(b) and 18 U.S.C. § 1836;

- Disgorgement, pursuant to G.L. 93, § 42B(a) and 18 U.S.C. § 1836, of the ill-gotten gains by Defendants' use of Spectra's trade secrets;

- A declaratory judgment that the confidentiality, non-competition, and non-solicitation covenants in Sections 9 and 11 of Arrigo Sr.'s Employment Agreement; Sections 9 and 11 of Arrigo Jr.'s Employment Agreement, Sections 10 and 12 of Turriza's Employment Agreement, and Sections 2 and 3 of the STBA, are valid and enforceable;

- A preliminary and permanent injunction prohibiting Defendants from violating the foregoing restrictive covenants;

- A preliminary and permanent injunction prohibiting Defendants from using or disclosing Spectra's trade secrets;

- A preliminary and permanent injunction requiring Defendants to return to Spectra all of Spectra's confidential information in their possession;

- A preliminary and permanent injunction prohibiting Defendants from destroying, deleting, concealing, or otherwise making inaccessible Spectra's confidential information and property and any evidence relevant to the claims in this action;

- Attorney's fees, costs, and expenses; and

- Any other relief as this Court deem just and proper.


Respectfully submitted,

Spectra Medical Devices, LLC,

By its counsel,

/s/ Lauren Papenhausen
Lauren Papenhausen (BBO #655527)
Daniel Medici (BBO #705650)
WHITE & CASE LLP
75 State Street

Boston, MA 02109-1814
Telephone: (617) 979-9300
lauren.papenhausen@whitecase.com
dan.medici@whitecase.com

*Counsel for Spectra Medical Devices, LLC*

Dated: October 21, 2022